Stadium Casino RE, LLC,            :
         Petitioner          :
                                   :
      v.                     :    No. 249 M.D. 2021
                                   :    ARGUED:  March 7, 2022
Pennsylvania Gaming Control Board,   :
SC Gaming OPCO LLC and          :
Ira Lubert,                     :
         Respondents      :

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**              **FILED:  February 8, 2023**

Before the Court are the preliminary objections of SC Gaming OPCO LLC (LLC) and Ira Lubert (Lubert) (collectively, SC Gaming), and the Pennsylvania Gaming Control Board to the Petition for Review in the nature of a complaint for declaratory and injunctive relief and in mandamus (Petition) filed in this Court's original jurisdiction by Stadium Casino RE, LLC.  For the reasons stated below, the preliminary objections are overruled.

## Background

The Petition alleges the following facts, which we must accept as true in ruling on preliminary objections.  In July 2004, the General Assembly passed, and Governor Edward G. Rendell signed into law, the Pennsylvania Race Horse

Development and Gaming Act (Gaming Act, or simply Act),[1] which authorized gaming in Pennsylvania. *See* Petition ¶ 19. The Gaming Act established an independent agency of the Commonwealth known as the Board. *See* Petition ¶ 20; *see also* 4 Pa.C.S. § 1201. The Board has sole authority over the conduct of gaming in Pennsylvania, as prescribed by the Gaming Act. *See id.*; *see also* 4 Pa.C.S. § 1202. The Board has the authority to, among other things, issue a slot machine license based upon the requirements of the Gaming Act. *See* Petition ¶ 21; *see also* 4 Pa.C.S § 1325(a). The Gaming Act initially established three categories of slot machine licenses: (a) Category 1 license, which allows a licensee to operate slot machines at an existing racetrack facility; (b) Category 2 license, which permits a licensee to operate slot machines at a stand-alone facility in major cities or tourist areas in Pennsylvania (*e.g.*, Philadelphia, Pittsburgh); and (c) Category 3 license, which permits a licensee to operate slot machines at an existing resort hotel. *See* Petition ¶ 22; *see also* 4 Pa.C.S §§ 1302, 1304-1305.

In 2017, the General Assembly established a new category of slot machine license - Category 4 license - which permits a licensee to operate mini-casinos, *i.e.*, casinos with 300 to 750 slot machines. *See* Petition ¶ 24; *see also* 4 Pa.C.S. § 1305.1. Section 1305.1(a) of the Gaming Act, 4 Pa.C.S. § 1305.1(a), authorized the Board to issue up to 10 Category 4 licenses only to existing Category 1, 2 or 3 licensees in good standing with the Board. *See id.* Section 1305.1(a) of the Gaming Act instructed the Board to conduct initial auctions beginning no later than January 15, 2018, and concluding by July 31, 2018, to determine which eligible bidders had the right to apply for the 10 available Category 4 licenses. *See* Petition ¶ 26; *see also* 4 Pa.C.S. § 1305.1(a). If a winning bid was not awarded at an initial auction, Section 1305.1(a) of the Gaming Act directed the Board to conduct

---

[1] 4 Pa.C.S. §§ 1101-1904.

2

subsequent auctions and complete all of them no later than August 31, 2018. *See id*.; *see also* 4 Pa.C.S. § 1305.2(b).

Between January and June 2018, the Board held five auctions. *See* Petition ¶ 27. Of the five winning bidders at these auctions, the Board issued Category 4 licenses to three of them. *See id*. The Board denied the application of one of the winning bidders, Mount Airy Casino Resort, because it was unable to obtain funding to build a casino. *See id*. One application remains pending. *See id*. Pursuant to Section 1305.2(b.1) of the Gaming Act, 4 Pa.C.S. § 1305.2(b.1), if a subsequent auction failed to generate any bids, the Board, in its discretion, may conduct additional auctions at which any Category 1, Category 2 or Category 3 slot machine licensees, or other qualified entities, may bid. *See* Petition ¶ 28; *see also* 4 Pa.C.S. § 1305.1(b.1). Such auctions were required to be completed by August 31, 2018. *See id*.; *see also* 4 Pa.C.S. § 1305.2(b)(3). The Board did not conduct further auctions prior to the August 31, 2018 statutory deadline. *See* Petition ¶ 30.

In June 2019, the General Assembly passed (and Governor Tom Wolf signed into law) an amendment to The Fiscal Code,[2] which provided specific instructions to the Board regarding additional Category 4 auctions. *See* Petition ¶ 31; *see also* 72 P.S. § 1724.1-E(c). Section 1724.1-E(c) of The Fiscal Code, 72 P.S. § 1724.1-E(c)(1), instructed the Board to conduct up to five auctions for the remaining available Category 4 slot machine licenses, beginning no later than September 4, 2019, and concluding by December 31, 2019. *See id*.; *see also* 72 P.S. § 1724.1-E(c)(1). The legislation further provided that if an auction failed to generate a bid, no further auctions shall be conducted. *See id*.; *see also* 72 P.S. § 1724.1-E(c)(2)(iv). Section 1724.1-E(c)(2)(v) of The Fiscal Code limited eligible

---

[2] Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. §§ 1-1805.

3

bidders to slot machine licensees as defined under Section 1103 of the Gaming Act,[3] 4 Pa.C.S. § 1103, that met the criteria in the legislation. *See id.*; *see also* 72 P.S. § 1724.1-E(c)(2)(v). On September 4, 2019, the Board held an auction for the right to apply for a Category 4 license, but received no bids. *See* Petition ¶ 32. Because there were no bids, the Board was not authorized to conduct further auctions. *See id.*

In May 2020, the General Assembly again amended The Fiscal Code. *See* Petition ¶ 33; *see also* 72 P.S. § 1724.1-E(e). Section 1724.1-E(e) of The Fiscal Code, 72 P.S. § 1724.1-E(e), directed the Board to conduct another auction by September 29, 2020 (i.e., within 90 days of the legislation's effective date), of any Category 4 slot machine license for which the Board has denied the application filed by the winning bidder of an initial auction, namely, the application the Board denied to Mount Airy Casino Resort. *See id.*; *see also* 72 P.S. § 1724.1-E(e)(1). Section 1724.1-E(e)(2)(iv) of The Fiscal Code, 72 P.S. § 1724.1-E(e)(2)(iv), narrowly expanded eligible bidders to include persons with an ownership interest in a slot machine licensee. *See* Petition ¶ 34; *see also* 72 P.S. § 1724.1-E(e)(2)(iv). In other words, there were only two categories of eligible bidders: (a) existing licensees; and (b) persons with an ownership interest in an existing licensee. *See id.* Section 1724.1-E(e)(2)(i) of the Fiscal Code, 72 P.S. § 1724.1-E(e)(2)(i), further required the Board to "conduct the auction according to the procedures under [Section 1305.2(c) of the Gaming Act,] 4 Pa.C.S. § 1305.2(c)." Petition ¶ 36; 72 P.S. § 1724.1-E(e)(2)(i).

Section 1305.2(c) of the Gaming Act, 4 Pa.C.S. § 1305.2(c), requires, among other things: (a) the winning bidder shall pay to the Board the bid amount within two business days following the auction; (b) if the winning bidder does not

---

[3] Section 1103 of the Gaming Act defines slot machine licensees as "[a] person that [sic] holds a slot machine license." 4 Pa.C.S. § 1103.

pay the bid amount within the time period required under paragraph 7, the second highest bidder shall be awarded the right to select a Category 4 location and apply for the Category 4 slot machine license; (c) the winning bidder shall submit an application for the Category 4 slot machine license within six months of the payment of the winning bid amount;[4] and (d) failure of the winning bidder to submit an application within the time under subparagraph (i) shall result in forfeiture of the bidder's right to apply for the license and forfeiture of the winning bid amount. *See* Petition ¶ 37; *see also* 4 Pa.C.S. § 1305.2(c)(7), (8), (10)(i), (10)(ii).

On September 2, 2020, the Board conducted an auction at which there were two bidders: Lubert and Stadium Casino. *See* Petition ¶ 38. Lubert was an eligible bidder because he has an ownership interest, held in his individual capacity, in Holdings Acquisition Co., LP, an existing Category 2 licensee that operates Rivers Casino Pittsburgh. *See* Petition ¶ 39. Stadium Casino was an eligible bidder because it holds a Category 2 license. *See* Petition ¶ 40. At the September 2, 2020 auction, Lubert submitted the winning bid at just over $10,000,000.00, and selected a location in Centre County, Pennsylvania, near Pennsylvania State University, for placement of the proposed Category 4 casino. *See* Petition ¶ 41. Lubert did not pay the entire winning bid to the Board himself, as required by Section 1305.2(c)(7) of the Gaming Act, 4 Pa.C.S § 1305.2(c)(7). *See* Petition ¶ 42. Instead, Robert Poole, Richard Sokolov, and possibly other persons or entities, invested in the payment for Lubert's winning bid. *See* Petition ¶ 42. Their contributions were not mere loans made in the ordinary course of business; rather, the contributions bought the investors an interest in the Category 4 license for which Lubert would have the right to apply as the winning bidder. *See* Petition ¶ 43.

---

[4] Section 1305.2(c)(10)(i) of the Gaming Act provides that "[t]he [B]oard may, in its discretion, extend this deadline for a period not to exceed two additional months." 4 Pa.C.S. § 1305.2(c)(10)(i).

After Lubert paid the winning bid on behalf of himself and his investors, he began preparing to apply to the Board for a Category 4 license. *See* Petition ¶ 44. On February 5, 2020, Lubert formed another entity, 2901 ECA Associates, LLC (LandCo), and according to LLC's application, LandCo's sole member and manager is now HoldCo. *See* Petition ¶ 46. On November 5, 2020, Lubert formed several limited liability companies, including LLC, SC Gaming HoldCo, LLC (HoldCo), and SC Gaming, LLC (SC NewCo). *See* Petition ¶ 45. LLC's sole member is also HoldCo; and HoldCo's two members are SC NewCo (98%) and Lubert (2%). *See* Petition ¶ 46; *see also* Petition Ex. 1 (ownership information provided to the Board). Neither the Board nor Lubert have identified who is a member of SC NewCo, the ultimate parent entity of the entities formed on November 5, 2020. *See id*.

On January 4, 2021, Bally's Corporation (Bally's) announced that it had signed an agreement with Lubert to jointly design, develop, construct and manage a Category 4 licensed casino in Centre County, the total costs of which are expected to be approximately $120,000,000.00. *See id*.; *see also* Petition Ex. 2 (Bally's Form 8-K (Mar. 4, 2021)). Bally's represented that it would "maintain a majority interest in the partnership, including 100% of the economic interests of all retail sports betting, online sports betting and iGaming activities associated with the project." *Id*.; Petition Ex. 2. On or around March 4, 2021, LLC, not Lubert, submitted an application to the Board for a Category 4 license. *See id*. The Board waited more than a month, until April 12, 2021, to make LLC's application public. *See* Petition ¶ 46. The vast majority of the public version is redacted. *See id.*; *see also* Petition Ex. 3 (LLC's Application). The public version entirely redacts the details about who owns and controls LLC, including details about the entity's stock, members, debt, and other security devices and options. *See id*. The public version also omits Bally's purported partnership with Lubert, which Bally's has already

6

announced publicly. *See id.* It appears from LLC's application that the ultimate parent entity, SC NewCo, is owned or controlled by persons other than Lubert, including the individuals who helped fund the winning bid. *See* Petition ¶ 47. The ownership information on the Board's website purports to break down who owns and controls LLC itself. *See* Petition ¶ 48; *see also* Petition Ex. 1. The breakdown identifies 14 different LLC principals, including Bally's entire Board of Directors, several of Bally's officers, Robert Poole, and Richard Sokolov. *See id.* Any of these principals may, by definition under the Gaming Act, have an interest in or ownership or control of LLC. *See id.* Although the Board's website states that Lubert owns 100% of LLC's common stock, the website expressly carves out other ownership interests such as preferred stock and options. *See id.*

In a March 23, 2021 letter to the Board's Executive Director (March 23, 2021 Letter), a copy of which was sent to Lubert's counsel, Stadium Casino detailed its concerns about SC Gaming's compliance with the Gaming Act and the Board's authority to consider LLC's application for a Category 4 license. *See* Petition ¶ 49; *see also* Petition Ex. 4. In the March 23, 2021 Letter, Stadium Casino requested that the Board address several issues, including: (a) whether Lubert forfeited his right to apply for a Category 4 license; (b) whether LLC is permitted to apply for a license; and (c) assuming other persons funded Lubert's winning bid, why his bid was not disqualified as inconsistent with the Gaming Act. *See id.*

In an April 2, 2021 letter to the Board (April 2, 2021 Letter), Lubert's counsel responded, focusing on an unrelated bid and application for a prior gaming license submitted by Stadium Casino's parent company, Stadium Casino, LLC (Stadium Parent), and an amended license application subsequently submitted by another of Stadium Parent's wholly-owned subsidiaries, Stadium Casino Westmoreland RE, LLC (Stadium Casino Westmoreland), in 2019. *See* Petition ¶ 50; *see also* Petition Ex. 5. Stadium Parent's bid and application timely complied

7

with all requirements in the Gaming Act. *See id*. Stadium Casino and Stadium Casino Westmoreland are sister entities, wholly owned by Stadium Parent, and they are all mirror images of each other, *i.e.*, they are owned and controlled by the exact same people in the exact same way. *See id*. In contrast, Lubert and LLC are different, not only because Lubert is an individual person and LLC is an entity, but also because LLC is owned or controlled by persons other than Lubert. Lubert's counsel's April 2, 2021 Letter did not address this critical distinction, nor did it address whose funds paid for his winning bid or who has an interest in LLC. *See id*.

By April 13, 2021 letter (April 13, 2021 Letter), the Board's Executive Director responded to Stadium Casino's March 23, 2021 Letter, stating that the Board received funds representing the winning bid amount of the auction bid on behalf of Lubert. *See* Petition ¶ 51; *see also* Petition Ex. 6. The April 13, 2021 Letter did not address any of Stadium Casino's other questions and concerns, including whether the Board has the statutory authority to consider LLC's application; instead, it stated that the Board will address any purported issues relating to compliance with the Gaming Act in determining LLC's suitability and financial fitness for a license. *See id*.

On April 20, 2021, after the Board made public the highly-redacted version of LLC's application discussed above, Stadium Casino again asked the Board to address the issues raised in its March 23, 2021 Letter. *See* Petition ¶ 52. Stadium Casino explained that these are not suitability or financial fitness issues that can be addressed after the Board completes its review; rather, they go to the core of whether the Board even has the authority to consider LLC's application. *See id.* Stadium Casino also asked the Board to make public the non-confidential information that is redacted from the public version of LLC's application, including (a) the identities of persons with an interest in LLC and its affiliates; and (b) the details about Lubert's and LLC's relationship with Bally's. *See id*. By April 28,

8

2021 letter (April 28, 2021 Letter) the Board responded to Stadium Casino, stating only that the Board has a different interpretation of the Gaming Act, and that any response that it provides will not serve to reconcile the differing positions. *See* Petition ¶ 53; *see also* Petition Ex. 7.

Because the Board did not respond to Stadium Casino's request that it make public the information that should not be redacted in LLC's application, Stadium Casino sent another letter dated May 19, 2021 (May 19, 2021 Letter), again requesting that non-confidential information in the application be made public, including (a) what interest the persons who funded Lubert's winning bid at the September 2, 2020 auction have in that bid or in LLC; (b) whether persons other than Lubert are members or otherwise have an interest in LLC or its affiliates; and (c) details about Bally's partnership with Lubert. *See* Petition ¶ 54; *see also* Petition Ex. 9.

In a June 2, 2021 letter (June 2, 2021 Letter), SC Gaming's counsel responded to Stadium Casino's May 19, 2021 Letter, refusing to respond to Stadium Casino's core questions - namely, who paid for Lubert's winning bid at the September 2, 2020 auction, and who has an interest in or control of LLC. *See* Petition ¶ 55; *see also* Petition Ex. 10. On June 15, 2021, Stadium Casino again followed up with the Board to: (a) underscore the importance of full disclosure, particularly because Lubert and LLC had repeatedly evaded answering Stadium Casino's main questions; and (b) reiterate its request that the Board make public the information it requested in its May 19, 2021 Letter. *See id*.; *see also* Petition Ex. 11. The Board has not responded to Stadium Casino's May 19, 2021 or June 15, 2021 Letters. *See* Petition ¶ 56.

On July 28, 2021, Stadium Casino filed the Petition seeking, in Count I: (1) a declaration that Lubert's bid is invalid because he failed to pay the full amount of the winning bid himself as required by the Gaming Act; (2) a mandamus

9

order requiring the Board to award Stadium Casino the right to select a Category 4 location and apply for a Category 4 slot machine license; and (3) such other legal and equitable relief as the Court may deem just and proper. *See* Petition at 23-24. Stadium Casino requests, in Count II: (1) a declaration that the Board lacks the authority to consider LLC's pending application for a Category 4 slot machine license; (2) an injunction enjoining the Board from further considering LLC's pending application for a Category 4 slot machine license; (3) as an alternative to the relief sought in Count I, a mandamus order requiring the Board to conduct another auction pursuant to Section 1305.2(c)(10)(ii) of the Gaming Act; and (4) such other legal and equitable relief as the Court may deem just and proper. *See* Petition at 25-26.

On September 17, 2021, SC Gaming filed preliminary objections to the Petition asserting: (1) this Court lacks subject matter jurisdiction; (2) Stadium Casino failed to exercise or exhaust a statutory remedy; and (3) Stadium Casino failed to state a viable claim as a matter of law. Also on September 17, 2021, the Board filed preliminary objections to the Petition alleging: (1) the conduct alluded to in Count I of the Petition is not prohibited by the Gaming Act; and (2) nothing in the Gaming Act precludes LLC from being an applicant for Category 4 licensure so long as Lubert is the sole owner at the time the license is awarded. By November 9, 2021 Order, this Court directed that the preliminary objections be listed for oral argument. The above-stated preliminary objections are now ripe for review.

## Discussion

> In ruling on preliminary objections, we must accept as true all well-pleaded material allegations in the petition for review [in the nature of a Complaint], as well as all inferences reasonably deduced therefrom. The Court need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. In order to sustain preliminary

10

> objections, *it must appear with certainty that the law will not permit recovery*, and any doubt should be resolved by a refusal to sustain them.
>
> A preliminary objection in the nature of a demurrer admits every well-pleaded fact in the [petition for review in the nature of a] complaint and all inferences reasonably deducible therefrom. It tests the legal sufficiency of the challenged pleadings and will be sustained only in cases where the pleader has clearly failed to state a claim for which relief can be granted. *When ruling on a demurrer, a court must confine its analysis to the [petition for review in the nature of a] complaint.*

*Torres v. Beard*, 997 A.2d 1242, 1245 (Pa. Cmwlth. 2010) (emphasis added; citations omitted). "'[C]ourts reviewing preliminary objections may not only consider the facts pled in the [petition for review in the nature of a] complaint, but also any documents or exhibits attached to it.' *Allen v. Dep't of Corr.*, 103 A.3d 365, 369 (Pa. Cmwlth. 2014)." *Foxe v. Pa. Dep't of Corr.*, 214 A.3d 308, 311 n.1 (Pa. Cmwlth. 2019).

### Demurrers

Both the Board and SC Gaming have asserted demurrers to the Petition, to a large extent based upon mischaracterizations of Stadium Casino's claims. They seize upon the allegation that, "Lubert did not pay the entire winning bid to the Board himself, as required by [the Gaming Act]" and argue that the Act does not so require. Both Stadium Casino and the Respondents make plausible arguments concerning whether the provision cited[5] should be read to imply such a requirement, but even if we agree, *arguendo*, with Respondents on that issue, it is of no moment. The primary claim asserted in the Petition is that LLC is not eligible to apply for the license at issue. On that point, the Board's demurrer asserts that the Act does not prohibit the winning bidder "from forming a *solely owned entity* (e.g., corporation, limited

---

[5] *See* 4 Pa.C.S. § 1305.2(c)(7).

liability company) to be the applicant for said license. . . . [R]ather the winning bidder can form a separate entity to be the applicant, *so long as owned solely by the bidder*." (Board's Prelim. Objs. at p.6) (emphasis added). However, this principle is not in issue. Rather, Stadium Casino alleges, upon information and belief, that LLC is *not* solely owned by Lubert, but is owned and controlled in large part by others. This allegation is more than a bare unsupported assertion, but is based on various circumstantial evidence outlined in the Petition. While the ownership information provided to the Board identifies LLC as 100% owned by Lubert, and SC Gaming so asserts, Stadium Casino has been denied information on this issue and it has been redacted from the public version of LLC's application. Accordingly, a material factual dispute exists precluding the grant of the demurrers.

### Failure to Exhaust Administrative Remedies

In addition to the demurrers, SC Gaming objects to the Petition asserting that: (1) this Court lacks subject matter jurisdiction; and (2) Stadium Casino failed to exercise or exhaust a statutory remedy.

> A party may not seek judicial resolution of a dispute until he or she has exhausted available statutory or administrative remedies. The doctrine "reflects a recognition of the general assembly's directive of strict compliance with statutorily prescribed remedies" and it also acknowledges that "an unjustified failure to follow the administrative scheme undercuts the foundation upon which the administrative process was founded." *Jordan v. Fayette Cty. Bd. of Assessment Appeals*, 782 A.2d 642, 646 (Pa. Cmwlth. 2001) (quoting *Shenango Valley Osteopathic Hosp. v. Dep't of Health*, . . . 451 A.2d 434 ([Pa.] 1982)). If a party fails to pursue a statutory remedy, the court is without power to act until the statutory remedies have been exhausted[.]

*Martel v. Allegheny Cnty.*, 216 A.3d 1165, 1172 (Pa. Cmwlth. 2019) (citations omitted).

12

Further,

> [w]hile the failure to exhaust a statutory or administrative remedy normally bars this Court from hearing claims of declaratory or injunctive relief with respect to agency action, "the exhaustion doctrine is neither inflexible nor absolute." *Keystone ReLeaf* [*LLC v. Pa. Dep't of Health*], 186 A.3d [505,] 513 [(Pa. Cmwlth. 2018) (*en banc*)]. Our Supreme Court has recognized three exceptions to the doctrine of exhaustion of statutory remedies where (i) the jurisdiction of an agency is challenged, (ii) the constitutionality of the statute is challenged or (iii) the remedy at law is inadequate.

*Cnty. of Berks v. Pa. Off. of Open Recs.*, 204 A.3d 534, 540 (Pa. Cmwlth. 2019).

SC Gaming first argues that Stadium Casino never complained to the Board in an administrative proceeding that the Board erred in accepting Lubert's payment of the winning bid. Section 35.20 of the General Rules of Administrative Practice and Procedure (GRAPP) provides: "Actions taken by a subordinate officer under authority delegated by the agency head may be appealed to the agency head by filing a petition within 10 days after service of notice of the action." 1 Pa. Code § 35.20. Further, Section 493a.1(a)(6) of the Board's Regulations expressly permit the filing of "[a]ppeals of staff decisions under [Section 35.20 of GRAPP] (relating to appeals from actions of the staff)." 58 Pa. Code § 493a.1(a)(6). SC Gaming argues that because the acceptance of Lubert's payment for the winning bid was a Board staff decision, Stadium Casino had the right to appeal that action to the Board within ten days but did not do so. This argument fails to take into account that there was no basis to object to the acceptance of Lubert's bid; it is undisputed that Lubert was an eligible bidder and that he won the auction. This administrative remedy is simply inapplicable to the claim asserted in this action, i.e., that another entity, LLC, was ineligible to apply for the license pursuant to Lubert's successful bid.

In addition, SC Gaming contends that Stadium Casino has not intervened or sought to intervene in the ongoing administrative proceeding in which the Board is considering LLC's application. Stadium Casino argues that this remedy is inadequate. Even if a person is granted the right to intervene, its participation is limited. "Except when the Board determines that it is necessary to develop a comprehensive evidentiary record, the participation of [an intervener] will be limited to the presentation of evidence through the submission of written statements attested to under oath." 55 Pa. Code § 441a.7(z)(6) (licensing hearings for slot machines). Here, Stadium Casino would not be in a position to present evidence of its claim unless it were able to obtain discovery of the information that has, so far, been withheld. "The ability to obtain discovery in an administrative proceeding before the Board or presiding officer is committed to the discretion of the Board or presiding officer and will generally be limited to the information, documents and list of witnesses that *any party* will present during a hearing." 58 Pa. Code § 493a.11(a) (emphasis added) (discovery).[6] In addition, "[c]onfidential information furnished to or obtained by the Board or the Bureau from any source will not be discoverable under this subsection. If a request for discovery involves confidential information, a party may file a motion for protective order and the presiding officer will make a determination as to what is deemed confidential." 58 Pa. Code § 493a.11(f) (discovery). Given the Board's refusal to even consider Stadium Casino's informal claims that LLC is ineligible nor to give Stadium Casino any information on LLC's ownership, we do not have any reason for optimism, let alone confidence, that the Board will exercise its discretion to allow such discovery to Stadium Casino, even

---

[6] An "intervener" is defined as "[a] person who petitioned to intervene in a proceeding and who was admitted by the Board as a participant to the proceeding." 58 Pa. Code § 491a.2 (definitions). A "participant" is defined as "[a] person admitted by the Board to limited participation in a proceeding." *Id*. A "party" is defined as "[a] person who is named in or admitted to a proceeding before the Board and who has a direct interest in the subject matter of the proceeding." *Id*.

14

if intervention were allowed. The mere *possibility* that an administrative remedy *may* be adequate, however unlikely, is insufficient to bar equitable relief. *See Feingold v. Bell of Pa.*, 383 A.2d 791, 794 (Pa. 1977) (holding that "[t]he mere existence of a remedy does not dispose of the question of its adequacy; the administrative remedy must be 'adequate and complete.'") Moreover, if Stadium Casino were limited to the usual role of intervener and denied discovery, the Board's broad discretion over the matter would likely preclude any prospect of appellate relief from a decision awarding the license to LLC. For the same reason, SC Gaming's objection that Stadium Casino's ability to appeal to our Supreme Court is an adequate administrative remedy is unavailing.

Finally, SC Gaming asserts that the issue raised in Stadium Casino's Petition is not ripe for adjudication. SC Gaming maintains that there is no licensure decision by the Board, and no certainty the Board will approve SC Gaming's license application when, at some future date, the Board makes its decision. Thus, Stadium Casino declares that whatever theoretical harm Stadium Casino seeks to address in this Court does not exist today, and may never come to pass. Accordingly, Stadium Casino asks this Court to dismiss the Petition for lack of a controversy that is ripe for review, pursuant to Pennsylvania Rule of Civil Procedure (Rule) 1028(a)(1) ("lack of jurisdiction over the subject matter of the action"). However, Stadium Casino is not challenging the Board's potential future issuance of a Category 4 license to LLC. Rather, it is seeking a declaration that LLC is ineligible to seek the license and, therefore, the Board lacks the authority to *consider* LLC's application. Such consideration, far from a theoretical future prospect, is already ongoing. Accordingly, this dispute is ripe.[7]

---

[7] Stadium Casino also asserts that its claims fall into an exception to the exhaustion doctrine because it is bringing a purely *legal* challenge to the Board's authority over SC Gaming's application. Stadium Casino cites to *Southeastern Pennsylvania Transportation Authority v. City of Philadelphia*, 101 A.3d 79 (Pa. 2014) (*SEPTA*), to support its position. The Court held that SEPTA was not required to exhaust its administrative remedies because SEPTA raised a purely

## Conclusion

For the above stated reasons, the preliminary objections are overruled.

_____
**BONNIE BRIGANCE LEADBETTER**
**President Judge Emerita**

Judge Covey did not participate in the decision for this case.

---

legal challenge to an agency's jurisdiction, not a factual one.  Here, however, resolution of Stadium Casino's claim that LLC is ineligible hinges on the factual question of LLC's ownership, so this doctrine is inapplicable.

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stadium Casino RE, LLC,        :
              Petitioner       :
                                :
        v.               :     No. 249 M.D. 2021
                                :
Pennsylvania Gaming Control Board, :
SC Gaming OPCO LLC and      :
Ira Lubert,                   :
            Respondents    :

## O R D E R

AND NOW, this 8th day of February, 2023, the Preliminary Objections to the Petition for Review of Petitioner, Stadium Casino RE, LLC, are OVERRULED. Respondents, Pennsylvania Gaming Control Board, SC Gaming OPCO LLC and Ira Lubert, are directed to file answers to the Petition for Review within thirty (30) days of the date of this order.

_____
**BONNIE BRIGANCE LEADBETTER**
**President Judge Emerita**